James H. Dillard II
21 Raptors View Avenue
North Las Vegas, NV 89031
Telephone: (725) 314-4444
Email: djtorch07@gmail.com
Plaintiff, Pro Se

✓ FILED    ____ RECEIVED
____ ENTERED    ____ SERVED ON

APR 07 2026

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ AMMi DEPUTY

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JAMES H. DILLARD II,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH RUCKER, a/k/a "Mr. Rucker"; DAMON LOVELL, a/k/a "Peso Man"; MARQUIS EDWARDS, a/k/a "Marquis Platt"; RUMBLE, INC.; and DOES 1–10,<br><br>Defendants. | Case No. 2:24-cv-01143-APG-BNW<br><br>**FIFTH AMENDED COMPLAINT FOR:**<br><br>(1) Willful Copyright Infringement<br>(2) Contributory Copyright Infringement<br>(3) Vicarious Copyright Infringement<br>(4) Defamation Per Se<br>(5) False Light<br>(6) Intentional Infliction of Emotional Distress<br>(7) Invasion of Privacy<br>(8) Civil Conspiracy<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.      Plaintiff James H. Dillard II ("Plaintiff" or "Dillard") brings this action to halt an ongoing, coordinated campaign by Defendants that has caused, and continues to cause, substantial copyright, reputational, emotional, and economic harm to Plaintiff.

2.      Defendants Kenneth Rucker, Damon Lovell, and Marquis Edwards (collectively, the "Individual Defendants") reproduced, publicly displayed, and monetized Plaintiff's federally registered audiovisual and photographic works without authorization.

1

3.   After Plaintiff issued formal takedown notices under the Digital Millennium Copyright Act, 17 U.S.C. § 512, Defendants republished the same or substantially similar infringing content across multiple online platforms, including Defendant Rumble, Inc.

4.   The Individual Defendants further used platform features and social media tools to defame, dox, and harass Plaintiff, including the public disclosure of Plaintiff's residential address, family information, and other private facts.

5.   Defendants' campaign has generated substantial advertising and subscription revenue for Defendants while inflicting compounding reputational, emotional, and economic harm on Plaintiff, including loss of business opportunities, professional standing, and personal security.

6.   Plaintiff seeks to enjoin Defendants' conduct and obtain all appropriate legal and equitable relief, including injunctive, statutory, and compensatory remedies.

7.   Plaintiff's allegations are supported by contemporaneous documentary and video evidence, including copyright registration certificates, an infringement log, substantial-similarity comparisons, DMCA notices, transcripts, screenshots, livestream captures, and related communications. These materials are attached as Exhibits 1 through 54 and are expressly incorporated by reference as though fully set forth herein.

**PARTIES**

8.   Plaintiff James H. Dillard II is a natural person and a citizen of the United States domiciled in Clark County, Nevada.

9.   Plaintiff is the sole owner of valid, federally registered copyrights in the original audiovisual and photographic works identified in paragraph 18 and in Exhibit 1.

10. Defendant Kenneth Rucker ("Rucker"), also known as "Mr. Rucker," is an individual residing at 5200 Town and Country Boulevard, #2124, Frisco, Texas 75034.

11. Rucker operates, and at relevant times has operated, video channels on YouTube, Rumble, TikTok, Twitch, and Locals, including channels operated under the brand "Team Rucker."

12. Defendant Damon Lovell ("Lovell"), also known as "Peso Man," is an individual residing at 6702 Hanlon Court, Houston, Texas 77083.

13. Lovell operates, and at relevant times has operated, video channels on Rumble and YouTube.

14. Defendant Marquis Edwards ("Edwards"), also known as "Marquis Platt" and "Marquis912," is an individual who, on information and belief and by his own public admission, resided at 5502 Crescent Loop, Blackshear, Georgia 31516 and, beginning on or about October 30, 2025, relocated to North Las Vegas, Nevada, within this District.

15. Edwards operates, and at relevant times has operated, video channels on Rumble and other platforms.

16. Defendant Rumble, Inc. ("Rumble") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Longboat Key, Florida. Rumble operates the online video platform located at www.rumble.com and its wholly owned subsidiary Locals (locals.com).

17. Does 1 through 10 are individuals or entities whose true identities are presently unknown to Plaintiff, but who participated in the publishing, republishing, modification, monetization, and/or administrative abuse described in this Complaint.

18. Plaintiff will amend this Complaint to identify the Doe Defendants when their identities are ascertained through discovery.

**JURISDICTION**

19. This Court has original subject matter jurisdiction over Counts I through III pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338(a) (copyright), because those claims arise under the Copyright Act of 1976, 17 U.S.C. § 101 et seq.

20. This Court has supplemental jurisdiction over Counts IV through VIII pursuant to 28 U.S.C. § 1367(a), because those state law claims are so related to the federal copyright claims that they form part of the same case or controversy under Article III of the United States Constitution and arise from a common nucleus of operative fact.

21. This Court has personal jurisdiction over all Defendants pursuant to the Nevada long-arm statute, Nev. Rev. Stat. § 14.065, which extends to the full reach permitted by the Due Process Clause. Due process is satisfied where a defendant maintains sufficient minimum contacts with the forum state such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). For specific jurisdiction, the Ninth Circuit applies a three-part test: (1) the defendant must have purposefully availed itself of the privilege of conducting activities in the forum, or purposefully directed conduct toward the forum; (2) the plaintiff's claims must arise out of or relate to the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

22. The Individual Defendants—Lovell, Rucker, and Edwards—are each subject to specific personal jurisdiction in this District under the purposeful direction prong of *Schwarzenegger*. Each Individual Defendant committed intentional tortious acts expressly aimed

at the State of Nevada, causing harm each knew would be suffered by Plaintiff in this forum. *Calder v. Jones*, 465 U.S. 783, 789–90 (1984). Jurisdiction over each Individual Defendant is grounded in that defendant's own suit-related conduct directed at this District, and not merely in Plaintiff's Nevada residence or the effects felt here. *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014).

23. The Individual Defendants' suit-related Nevada-directed conduct includes, without limitation: (a) publicly disclosing Plaintiff's North Las Vegas, Nevada residential address in monetized broadcasts delivered to mass audiences, with knowledge that the disclosure would injure a Nevada resident at that location; (b) issuing explicit threats of physical violence directed at Plaintiff's known Nevada address; and (c) publishing defamatory statements and false characterizations of Plaintiff's identity with actual knowledge that Plaintiff resides, works, and suffers reputational and economic harm in Nevada. See Exhibits 7, 8, 11, 16, 17, 20, 25, 27, and 31. Each of Plaintiff's claims against the Individual Defendants arises directly out of this Nevada-directed conduct. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 362 (2021); *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017).

24. Defendant Edwards independently and additionally submitted himself to this Court's jurisdiction by physically relocating to North Las Vegas, Nevada and, while present within this District, publishing additional infringing content and direct threats of violence against Plaintiff. See Exhibit 31.

25. This Court has specific personal jurisdiction over Defendant Rumble, Inc. under the three-part *Schwarzenegger* test. Plaintiff does not assert general jurisdiction over Rumble. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). As set forth in paragraphs 26 through 28

below, Rumble's own suit-related conduct satisfies each prong of the specific jurisdiction analysis independently.

26.    Rumble purposefully availed itself of, and purposefully directed conduct toward, Nevada by operating a commercial, monetized video platform that distributes video content to Nevada viewers and derives revenue from advertising and other monetization associated with Nevada viewership and engagement, including viewership of the infringing content at issue in this action. *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1229–31 (9th Cir. 2011); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984). Plaintiff's jurisdictional theory is grounded in Rumble's own suit-related forum contacts and commercial exploitation of the Nevada market, and not merely in Plaintiff's residence or the location where Plaintiff experienced injury. *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014).

27.    Rumble's post-notice conduct further confirms its forum-directed suit-related contacts. Plaintiff transmitted more than thirty-six (36) DMCA takedown notices to Rumble's designated copyright agent, each identifying specific infringing Rumble URLs, the copyrighted works at issue, and Plaintiff as a Nevada resident at his North Las Vegas address. After receiving this notice, Rumble in many instances continued to host, stream, and monetize the specifically identified infringing content, including through monetization arrangements associated with Defendant Rucker's channel. On April 7, 2026, Plaintiff accessed two representative infringing Rumble URLs—https://rumble.com/v6v4e35-commercial-break-ad-we-dont-play.html ("We Don't Play," Exhibit 5) and https://rumble.com/v7738aw-the-downfall-of-a-certain-dj-part-1-how-it-started.html ("The Downfall of a Certain DJ Part 1")—from his North Las Vegas, Nevada residence and was served a Rumble Premium subscription advertisement and health-related commercial advertisements, confirming that Rumble's monetization infrastructure actively

6

delivered advertising revenue from Nevada viewership of the infringing content on that date. See Exhibit 56.

28. Plaintiff's claims against Rumble arise out of or relate to Rumble's forum-connected hosting, streaming, distribution, and monetization of the specifically identified infringing content, including after Rumble received repeated work-specific DMCA notices identifying the infringing URLs and copyrighted works at issue. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 362 (2021); *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 265 (2017); *Axiom Foods, Inc. v. Acerchem International, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). This case is unlike circumstances where forum targeting is not plausibly established by the defendant's own conduct. *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1209 (9th Cir. 2020).

29. The exercise of specific personal jurisdiction over Rumble is reasonable. Nevada has a substantial interest in providing its residents a forum to redress copyright infringement and related harms perpetuated by a commercial platform that repeatedly received individualized notice of the harm and continued to profit from it. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77 (1985). In the alternative, and to the extent Rumble contends its contacts with any single state are insufficient for constitutional purposes, Plaintiff invokes Federal Rule of Civil Procedure 4(k)(2) with respect to the federal copyright claims, because Rumble operates a nationally distributed commercial video platform and has purposefully availed itself of the United States market as a whole, and the copyright claims arise from that nationwide commercial activity.

30. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here,

including: the repeated identification and targeting of a Nevada resident by name and home address in monetized broadcasts; the repeated delivery of DMCA takedown notices from Plaintiff's Nevada address to Defendants; the continued hosting and monetized distribution of infringing content to Nevada-based audiences; and the economic, reputational, and emotional harm sustained by Plaintiff within this District.

31.    Venue is further proper under 28 U.S.C. § 1400(a) with respect to all claims arising under the Copyright Act because each Defendant may be found in this District. In copyright actions, a defendant may be found in any district where the defendant would be amenable to personal jurisdiction if the district were treated as a separate state. *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010). Because this Court has specific personal jurisdiction over each Defendant on the copyright claims as established in paragraphs 21 through 29 above, each Defendant may be found in this District within the meaning of § 1400(a).

## FACTUAL ALLEGATIONS

### A. Plaintiff's Channel and Works

32.    Prior to June 2023, Plaintiff operated the YouTube channel "DJ Torch and Friends," which focused on commentary advocating for the respectful treatment of women and opposing exploitative "Red Pill" ideology.

33.    At all relevant times, Plaintiff was a private individual with no public persona outside of his content channel. Plaintiff did not seek or receive public attention beyond his online activities and did not voluntarily inject himself into any public controversy concerning Defendants or their conduct.

8

34. Plaintiff is the sole owner of the following federally registered works, identified in the Certificates of Registration attached as Exhibit 1. The works designated as Asserted Works below are the subject of the copyright claims in this action:

| Reg. No. | Type | Effective Date | Title / Description |
|---|---|---|---|
| VAu 1-516-282 | Photographic Works (151 photographs) | August 31, 2023 | DJ Torch Music Photo 1 (includes "ShirtoffJames," "Bathroom Selfie," and related works) |
| PAu 4-221-226 | Audiovisual Works (Group) | April 24, 2024 | "GreyShirt," "Jimi Hendrix," "Things Black Men Should Focus on Instead of Constantly Blaming Black Women," and related works |
| PAu 4-243-219 | Audiovisual Works | June 29, 2024 | *Not asserted in this action.* Registered after case filing date of June 12, 2024. See Exhibit 1. |
| PAu 4-238-492 | Audiovisual Works | August 15, 2024 | *Not asserted in this action.* Registered after case filing date of June 12, 2024. See Exhibit 1. |

Registrations PAu 4-243-219 (effective June 29, 2024) and PAu 4-238-492 (effective August 15, 2024) are identified in Exhibit 1 for completeness. Both registrations were issued after the filing of this action on June 12, 2024 and are therefore not the subject of claims asserted herein. Plaintiff expressly reserves all rights with respect to the works covered by those registrations, including the right to assert claims in a separate proceeding.

35. Plaintiff's registered works include original livestream recordings, DJ performance videos, photographs, and commentary content, all created and published by Plaintiff and none of which have been licensed to any Defendant.

**B. Defendants' Campaign — Overview**

36. Beginning in June 2023, the Individual Defendants initiated and maintained a deliberate, coordinated, multi-platform campaign targeting Plaintiff. The campaign's objective

9

was to destroy Plaintiff's online presence, reputation, professional standing, and personal security.

37. The campaign has continued without interruption through the date of this Complaint and has escalated during the pendency of this federal action.

38. Defendants' campaign was not limited to Plaintiff alone. Defendants also targeted Plaintiff's subscribers and associated individuals as a deliberate tactic to isolate Plaintiff, destroy his audience, and amplify harm to his reputation and channel. Exhibit 15 documents Prism—a subscriber and associated individual targeted by the same campaign—explicitly requesting on a public broadcast that Rucker leave her alone, stating that she had made this request repeatedly over six months: "I told Mr. Rucker to leave me alone in the beginning. I told him more than once to leave me alone … for six months I can tell him to leave me alone, to stop uploading my name and everything." Exhibit 15 at 01:59:34–01:59:50. Rucker acknowledged on that same broadcast that both Plaintiff and Prism had told him to stop, yet the campaign continued and escalated.

### C. Copyright Infringement

39. Without authorization, license, or permission from Plaintiff, the Individual Defendants reproduced, publicly performed, publicly displayed, and distributed substantial portions of Plaintiff's registered works in monetized videos published on YouTube, Rumble, Locals, and other platforms.

40. A consolidated, timestamped log of at least sixty-two (62) distinct infringing videos across platforms is attached as Exhibit 2.

41. Photographic side-by-side comparisons showing substantial similarity between Plaintiff's registered photographs and Defendants' unauthorized uses are attached as Exhibit 2a.

42. On September 2, 2023, in a broadcast titled "I'm BACK and I'm LIVE!," Rucker admitted on camera to the premeditated use of Plaintiff's content:

> *"Me, him, and Marquis devised the plan of always using his content,*
> *editing it, making sure we do commentary so it can fall under fair use, so*
> *we can profit from him putting out his trash."*
> *Exhibit 14 at 00:12:31–00:13:00.*

43. On November 10, 2024 — five months after Plaintiff filed this federal action — Rucker stated in "At the End of the Day" on Rumble:

> *"How do you like all the sound bites I've been playing in the background?*
> *Oh, it's gonna get worse."*
> *Exhibit 27 at 00:10:42–00:10:53.*

44. Following the removal of content from YouTube pursuant to Plaintiff's takedown notices, Defendants migrated to Rumble and continued uploading the same or substantially similar infringing content.

### D. DMCA Notices and Rumble's Non-Response

45. From February 19, 2024 through July 17, 2024, Plaintiff transmitted at least thirty-six (36) DMCA takedown notices to Rumble's designated DMCA Agent regarding infringing content uploaded by the Individual Defendants.

46. A summary log of those thirty-six (36) notices, including case numbers, dates, URLs, and identification of the infringed works, is attached as Exhibit 37.

47. Plaintiff continued to send DMCA notices after that period, including DMCA-Case #469423 (March 16, 2024, Exhibit 4); DMCA-Case #493777 (July 5, 2024, Exhibit 4-A); DMCA-Case #751036 (September 6, 2025, Exhibit 4-A); and DMCA-Case #760020 (September 27, 2025, Exhibit 5).

48.    As of March 7, 2026, at least twelve infringing Rumble and Locals URLs that were the subject of Plaintiff's DMCA notices remained publicly accessible and monetized. Exhibit 36.

*E. CCB Proceedings*

49.    On or around August 10, 2023, Plaintiff filed a claim with the United States Copyright Claims Board ("CCB") seeking redress for the infringement campaign described herein.

50.    Plaintiff ultimately filed four CCB claims against the Individual Defendants. All four of Plaintiff's CCB claims were found compliant by the CCB.

51.    Despite the CCB's compliance findings, each of Plaintiff's four proceedings was dismissed without adjudication on the merits. Defendants Rucker and Lovell exercised the statutory opt-out available under 17 U.S.C. § 1506(aa), terminating those proceedings before any determination of Plaintiff's claims could be made.

52.    Defendant Edwards did not appear and avoided the proceedings altogether.

53.    No CCB finding was made regarding the merits of Plaintiff's copyright claims. The dismissals reflect Defendants' procedural choices, not any deficiency in Plaintiff's claims.

54.    On December 17, 2023 — approximately four months after Plaintiff's first CCB filing — Rucker filed CCB Claim No. 23-CCB-0408 against Plaintiff, alleging misrepresentation under 17 U.S.C. § 512(f).

55.    Unlike Plaintiff's four compliant claims, Rucker's claim was found non-compliant by the CCB on November 19, 2024.

56. Rucker withdrew the claim on November 20, 2024 — the day following the non-compliance determination. CCB Claim No. 23-CCB-0408 was dismissed without adjudication on the merits and Rucker's allegations were never adjudicated.

56a. On April 4, 2024 — during the pendency of active CCB proceedings and on the final day within the amendment window for Plaintiff's claims — Defendant Rucker published a Rumble livestream titled "LIVE: I react to a Dj Torch LIVE in real time." On camera, Rucker admitted that he had deliberately assembled and published a thumbnail collage using Plaintiff's copyrighted photographs and screenshots: "that whole goddamn thumbnail is all your pictures that you don't like, that you're claiming they're copy written and they're all not. And I purposely did it." Exhibit 22 at 00:44:50. He then explained his deliberate timing: "And I purposely did it because this was the last day for you to even try to amend the claim." Id. He further stated: "I used a lot, a lot of your screenshots to make your thumbnail. Exactly. And I did it tonight. So fuck you. And how you feel." Id. He also told Plaintiff directly: "Do you know I'm going to use this against you? Oh yeah, prism, do you know I'm gonna use this against you on that John Doe lawsuit?" Exhibit 22 at 00:43:47. Co-Defendant Lovell, appearing in the same broadcast, stated to a live audience: "I mean, he is on drugs. I mean, literally," Exhibit 22 at 01:20:45, and declared: "he lied. He, he tried to actually tried to commit fraud," id. at 01:33:13. Lovell also threatened: "I'm gonna try to go up to your mama's house… I want that house" and "I put a lien on your fucking mama's house." Id. at 01:36:51. Rucker subsequently set the video to "restricted/private" on Rumble. Exhibit 22 at p. 005.

57. On July 18, 2024 — the same date the CCB issued its Order Scheduling Settlement Conference — Rucker published a Rumble broadcast in which he declared:

> *"There will be no settlement. There will be no fucking settlement… Quote me, put that, file that shit."*

13

*Exhibit 34 at 00:27:01.*

58.    Rucker further stated that his objective in the CCB proceeding was to obtain a document he could use to further his extrajudicial campaign against Plaintiff, not to resolve any bona fide legal dispute.

***F. Defamation, Threats, and Privacy Violations — Overview***

59.    Beginning in June 2023, the Individual Defendants published false statements of fact about Plaintiff to mass audiences through monetized livestream broadcasts, video uploads, and persistent titles and thumbnails.

60.    The Individual Defendants disclosed Plaintiff's private personal information — including his residential address, employment, financial circumstances drawn from court filings, and details about his family members — in monetized broadcasts.

61.    The Individual Defendants issued explicit threats of physical violence against Plaintiff in multiple broadcasts, including during the pendency of this federal action.

**COUNT I**

**WILLFUL COPYRIGHT INFRINGEMENT**

**(17 U.S.C. § 501)**

**(Against Defendants Rucker, Lovell, Edwards, and Does 1–10)**

62.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

***Ownership and Registration***

14

63.    Plaintiff owns valid, registered copyrights in the Asserted Works—specifically the works covered by VAu 1-516-282 (effective August 31, 2023) and PAu 4-221-226 (effective April 24, 2024)—as evidenced by the Certificates of Registration attached as Exhibit 1.

64.    The Certificates of Registration attached as Exhibit 1 constitute prima facie evidence of the validity of Plaintiff's copyrights and the facts stated therein. 17 U.S.C. § 410(c).

*Unauthorized Reproduction, Display, and Distribution*

65.    Without authorization, license, or permission from Plaintiff, Defendants reproduced, publicly performed, publicly displayed, and distributed Plaintiff's Asserted Works in violation of 17 U.S.C. § 106.

66.    Defendants downloaded, ripped, screen-recorded, or otherwise created fixed digital copies of Plaintiff's protected works.

67.    Defendants altered, edited, "chopped and screwed," looped, and composited Plaintiff's original content to create new video files containing Plaintiff's copyrighted material.

68.    Defendants uploaded the infringing videos to publicly accessible, monetized channels on Rumble, YouTube, Locals, and other platforms, transmitting the works to the public and displaying them on screen.

*Representative Infringing Acts*

69.    The following are representative examples of infringing acts committed by each Individual Defendant on the Rumble platform. Each example involves the unauthorized use of Plaintiff's registered works in a monetized commercial video.

*Rucker*

15

70. On or about January 28, 2024, Rucker uploaded "PSA: Much Ado About a Self-Proclaimed Drug Addict" to Rumble, using Plaintiff's registered photograph "ShirtoffJames" (VAu 1-516-282) as a thumbnail and background.

71. On or about February 2024, Rucker uploaded "Big J Drops Bars on DJ Depends. Sponsored by Car Shield" to Rumble, incorporating portions of Plaintiff's registered audiovisual works. The title identifies a third-party commercial sponsor, confirming the video was produced in a monetized, commercial context.

72. On September 27, 2025, Rucker uploaded "Commercial Break Ad: We Don't Play" to Rumble, using Plaintiff's registered photograph "ShirtoffJames" (VAu 1-516-282). Plaintiff filed DMCA-Case #760020 regarding this upload. Exhibit 5.

73. On November 28, 2024 — five months after the filing of this federal action — Rucker uploaded "No Peace Until the Judge Tells Me" to Rumble, incorporating soundbites and the photograph "ShirtoffJames" from Plaintiff's registered works.

74. In that broadcast, Rucker stated: "I will take this shit until the fucking judge tells me to stop." Exhibit 29 at 3:32.

75. On March 13, 2026 — the date of this Court's screening order — Rucker published "The Downfall of a Certain 'DJ' (Part 1: How It Started)" to Rumble, incorporating Plaintiff's registered works at multiple timestamps (0:27–0:30, 0:37–0:39, 13:59–17:17, 18:10–19:03) and displaying Plaintiff's private email address on screen. Exhibit 32.

76. On May 26, 2024, Rucker uploaded "When It All Falls Down" to Rumble, incorporating at least sixteen soundbites of Plaintiff's registered works and displaying Plaintiff's registered photograph "Passport Bros" on screen at 14:28–14:31.

16

77. On March 20, 2026, during active litigation, Rucker broadcast "Worry About Getting a Job You Bum (Part 2)" on Rumble, incorporating content expressly labeled "not owned by Rucker" and announcing a continuing "downfall" series targeting Plaintiff by name. Exhibit 46 at 00:32:21.

*Edwards*

78. On March 16, 2024, Edwards uploaded "DJ Torch" to Rumble, using Plaintiff's registered photograph "ShirtoffJames" (VAu 1-516-282). Plaintiff filed DMCA-Case #469423. Exhibit 4.

79. On July 5, 2024, Edwards uploaded "What Happened to DJ Torch??? Prism's Downfall" to Rumble, again using Plaintiff's registered photograph "ShirtoffJames." Plaintiff filed DMCA-Case #493777. Exhibit 4-A.

80. On January 20, 2025, Edwards uploaded "DJ Mix at 6" to Rumble, incorporating portions of Plaintiff's registered audiovisual work "DJ Torch Performing a Super Hot Old School R&B Mix on Denon SC3900s" (PAu 4-221-226). Exhibit 3.

*Lovell*

81. On June 14, 2024, Lovell uploaded "The King of Dusty by the Dozens… He Lied to YouTube" to Rumble, incorporating Plaintiff's registered photograph "20130927_182047" (VAu 1-516-282) without authorization.

82. On December 23, 2024, Lovell uploaded "The Lies and Cries Will Not Work Anymore… Checkmate" to Rumble, which incorporated Plaintiff's protected work "Jimi Hendrix" (VAu 1-516-282) without authorization. Plaintiff filed DMCA-Case #565213 regarding this upload, but the video remained publicly accessible and monetized after notice.

83.   The representative acts identified above for Defendant Lovell are not exhaustive. The Consolidated Infringement Log attached as Exhibit 2 documents additional infringing acts by Lovell beyond those described in paragraphs 82 and 83.

84.   The representative acts identified above are substantiated by Exhibit 2 (Consolidated Infringement Log), which documents at least sixty-two (62) distinct infringing videos across platforms.

***Willfulness***

85.   Defendants' infringement was willful, intentional, and undertaken with full knowledge of Plaintiff's exclusive rights under the Copyright Act.

86.   In "I'm BACK and I'm LIVE!" (September 2, 2023), Rucker expressly admitted that the infringement was premeditated and coordinated among all three Individual Defendants. Exhibit 14 at 00:12:31–00:13:00.

87.   In "At the End of the Day" (November 10, 2024), broadcast during active federal litigation, Rucker stated: "How do you like all the sound bites I've been playing in the background? Oh, it's gonna get worse." Exhibit 27 at 00:10:42–00:10:53.

88.   In "Keisha Knows" (October 24, 2025), Rucker admitted to creating "sacrificial" channels and instructed viewers on how to "chop and screw" Plaintiff's content to evade platform enforcement. Exhibit 35.

89.   In "The Deletion of DJ Torch, and Friends Has Just Begun" (July 30, 2023), Rucker admitted: "I was purposely goading him into sending more copyright strikes." Exhibit 11 at 00:14:10.

90. On two separate occasions one week apart, Rucker admitted on camera that his channel removal resulted from his own conduct rather than from Plaintiff's copyright enforcement. Exhibits 14, 15.

91. On September 10, 2023, Rucker appeared as a guest on The Sprow Show and made multiple on-camera admissions directly relevant to his willfulness. Rucker acknowledged displaying Plaintiff's government name in a video thumbnail and characterized the conduct as doxing, stating: "I accidentally showed his government name on a thumbnail, which of course is a big no-no. And that could be deemed as doxing. So at that point, my channel was shut down." Rucker further acknowledged that YouTube shut his channel down for that conduct and stated: "you know what? You right, I deserve it." Exhibit 15 at 01:56:04–01:56:10; 02:06:02.

92. Despite this on-camera concession—in which Rucker acknowledged the wrongfulness of his conduct and agreed that YouTube's enforcement response was deserved—Rucker filed CCB Claim No. 23-CCB-0408 against Plaintiff on December 17, 2023, and publicly referenced FBI/IC3 complaints, attributing his channel removal to Plaintiff's copyright enforcement rather than to his own admitted misconduct. This sequence—public concession followed immediately by false legal attribution—confirms that Rucker's subsequent legal filings were not made in good faith.

93. On November 28, 2024, Rucker stated: "I will take this shit until the fucking judge tells me to stop." Exhibit 29 at 3:32.

94. In "A Failed Getaway & A Failed Deal" (October 19, 2024), Rucker admitted: "I purposely sneak it in there. I like put it in the middle of videos so they don't get flagged." Exhibit 53.

95. In "Keisha Knows" (October 24, 2025), Rucker further stated: "I'm coming right motherf***ing back… It's gonna be like Whack-a-Mole in this motherf***er." Exhibit 35.

96. Exhibits 46 and 46B further establish willfulness. On March 20 and 26, 2026, Rucker correctly identified clipping another person's audio as "a copyright violation" while simultaneously broadcasting content labeled "not owned by Rucker" and claiming fair use for identical conduct directed at Plaintiff. Exhibit 46 at 00:35:14; Exhibit 46B at 05:56–06:53.

96a. The April 4, 2024 livestream documented in Exhibit 22 provides independent and direct pre-filing evidence of willfulness. Rucker admitted on camera that he "purposely" built and published a thumbnail collage of Plaintiff's copyrighted images, and specifically timed that act to coincide with the last day of Plaintiff's CCB amendment window — stating: "I purposely did it because this was the last day for you to even try to amend the claim." Exhibit 22 at 00:44:50. This admission establishes that Rucker understood both Plaintiff's copyright claims and the active legal proceedings, and chose to commit an additional act of infringement in direct response to those proceedings. Deliberate infringement timed to a known legal deadline cannot constitute innocent infringement and satisfies the "knew or had reason to know" standard under 17 U.S.C. § 504(c)(2). See Derek Andrew, Inc. v. Poof Apparel Corp., 528 F.3d 696, 700 (9th Cir. 2008).

97. The CCB's compliance findings on Plaintiff's four claims further confirm that Defendants were on notice of legitimate, institutionally validated copyright claims at the time of the conduct documented herein. Defendants' continued reproduction and monetization of Plaintiff's registered works after receiving that notice was not the product of innocent misunderstanding but of deliberate choice. See paragraphs 49–53.

***Commercial Purpose and Market Substitution***

98. Defendants' uses of Plaintiff's works were commercial in nature. The infringing videos were monetized through advertising revenue and, in Rucker's case, through direct sponsorship arrangements with Rumble Premium.

99. In "At the End of the Day" (November 10, 2024), Rucker stated: "I'm making more money and getting more views on Rumble than you on mother[expletive] YouTube." Exhibit 27.

100. In "A Failed Getaway & A Failed Deal" (October 19, 2024), Rucker confirmed multi-platform monetization: "We were making money on Rumble…." Exhibit 53.

101. After the removal of infringing content from YouTube in response to Plaintiff's takedown notices, Defendants deliberately migrated to the Rumble platform to continue the infringement. Exhibit 27.

***Fair Use Is Unavailable as a Defense***

102. Defendants' commercial, non-transformative exploitation of the heart of Plaintiff's works — used as thumbnails, full-screen backgrounds, looped audio bumpers, and unaltered video clips — weighs heavily against any fair use defense under each of the four statutory factors. 17 U.S.C. § 107.

103. As to the first factor (purpose and character of the use), Defendants' use was commercial and not transformative. Rucker expressly admitted that the plan was to "always use his content, editing it, making sure we do commentary so it can fall under fair use," an admission that the commentary was manufactured as a pretext rather than a genuine transformative purpose. Exhibit 14 at 00:12:31–00:13:00.

104. A premeditated scheme to manufacture a fair use defense does not, as a matter of law, establish fair use; it establishes bad faith that weighs against the defendant. See Campbell v.

Acuff-Rose Music, Inc., 510 U.S. 569, 583 (1994) (commerciality and bad faith weigh against a finding of fair use).

105. As to the second factor (nature of the copyrighted work), Plaintiff's registered works are original creative expression — photographic self-portraits and audiovisual performances — entitled to the core protection of the Copyright Act.

106. As to the third factor (amount and substantiality of the portion used), Defendants took the "heart" of Plaintiff's works: the most recognizable and commercially valuable portions, used as thumbnails and recurring audio bumpers. See Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 564–65 (1985).

107. As to the fourth factor (effect on the market for the copyrighted work), Defendants' monetized reproduction directly substitutes for Plaintiff's own monetized channels and licensing market. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 585 (1994). A use designed to destroy the market for the copyrighted work cannot be a fair use.

***Damages Election***

108. Plaintiff elects statutory damages under 17 U.S.C. § 504(c) for each Asserted Work as to which the infringement on Rumble commenced after the applicable effective date of registration.

109. For VAu 1-516-282 (effective August 31, 2023), post-registration Rumble infringements are documented in Exhibits 4, 4-A, 5, 6, and 36 and are catalogued in Exhibit 2.

110. For PAu 4-221-226 (effective April 24, 2024), post-registration Rumble infringements are documented in Exhibits 3 and 36 and are catalogued in Exhibit 2.

111. For any infringement that commenced prior to the applicable registration date, Plaintiff seeks actual damages and Defendants' profits under 17 U.S.C. § 504(b).

112.   Plaintiff further seeks enhanced statutory damages for willful infringement up to $150,000 per infringed work under 17 U.S.C. § 504(c)(2); permanent injunctive relief under 17 U.S.C. § 502; an order for the destruction or other reasonable disposition of all infringing copies or phonorecords under 17 U.S.C. § 503; and recovery of full costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## COUNT II

## CONTRIBUTORY COPYRIGHT INFRINGEMENT

### (Against Defendant Rumble, Inc.)

113.   Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

114.   Direct copyright infringement occurred when the Individual Defendants violated Plaintiff's exclusive rights under 17 U.S.C. § 106 as set forth in Count I.

*Knowledge*

115.   Rumble had actual, specific knowledge of the infringement through Plaintiff's DMCA notices.

116.   From February through July 2024, Plaintiff sent Rumble at least thirty-six (36) DMCA takedown notices identifying specific infringing URLs, the identity of the uploaders, and the registered works at issue. Exhibit 37.

117.   Plaintiff sent Rumble additional DMCA notices after July 2024, including DMCA-Case #751036 (September 6, 2025, Exhibit 4-A); DMCA-Case #493777 (July 5, 2024, Exhibit 4); DMCA-Case #760020 (September 27, 2025, Exhibit 5); and supplemental notices on January 20, 2025 and March 15, 2025. Exhibits 3 and 38.

118. In the alternative, Rumble acted with willful blindness and deliberate indifference. Despite repeated notices identifying the same works, the same uploaders, and the same pattern of infringement, Rumble failed to respond substantively to the majority of Plaintiff's notices and continued to host and monetize the infringing content.

119. A service provider that designates a DMCA agent but systematically ignores compliant notices cannot claim safe harbor under 17 U.S.C. § 512. See Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1111 (9th Cir. 2007); Viacom Int'l Inc. v. YouTube, Inc., 676 F.3d 19, 35 (2d Cir. 2012) (willful blindness can establish knowledge under § 512(c)(1)(A)(ii)).

120. Rucker's on-camera admissions further confirm Rumble's knowledge. In "A Failed Getaway & A Failed Deal" (October 19, 2024), Rucker stated that Rumble employees were aware of the content dispute and had engaged with him directly about it. Exhibit 21.

121. In addition to the DMCA notices catalogued in Exhibit 37, Plaintiff sent at least seventy-three (73) additional communications to Rumble's moderation, legal, and platform-support addresses between September 2023 and October 2025, documenting the coordinated nature of the campaign. Exhibit 45.

122. On or about April 25, 2025, Rumble removed Rucker from the platform. Rucker subsequently stated publicly that he had been "booted" from Rumble, confirming both Rumble's actual knowledge and its technical and contractual capacity to terminate infringing users. Exhibit 55.

*Material Contribution*

123. Rumble materially contributed to the infringement by providing the hosting, streaming, monetization, and distribution infrastructure that enabled the Individual Defendants to reproduce, display, and profit from Plaintiff's registered works.

124. Rumble further assisted the infringement by failing to remove infringing content after receiving DMCA notice. Instead of disabling access, Rumble in many instances "privated" infringing videos, allowing them to remain on the platform and, on information and belief, accessible to subscribers and to search indexing.

125. Representative examples of post-notice content that remained on Rumble include "DJ Torch vs Marquis912" (Edwards/Platt), noticed April 7, 2024 (DMCA-Case #472906), which remained active more than 350 days after notice.

126. Further examples include "The Lies and Cries Will Not Work Anymore Checkmate" (Lovell), noticed December 23, 2024 (DMCA-Case #565213), which remained active as of the filing of this Complaint.

127. Further examples include "Janet Jackson & MR. RUCKER Asks a Failed DJ Some Important Questions" (Rucker, October 13, 2024), noticed October 15, 2024 (DMCA-Case #523789), which remained active after notice.

128. Further examples include "Downfall Preview: What Is He Watching Every Day?" (Rucker), noticed February 18, 2026 (DMCA-Case #883726), which remained active as of April 5, 2026.

129. Rumble's failure to act was compounded by facilitating content migration within its own corporate structure. Locals (locals.com), a wholly owned subsidiary of Rumble acquired in October 2021, was used to republish content subject to Plaintiff's DMCA notices behind a paywall.

130. Rumble's knowledge of infringement on the parent platform is imputed to its wholly owned subsidiary Locals, and Locals' knowledge is imputed to Rumble.

25

131.    As a direct and proximate result of Rumble's contributory infringement, Plaintiff has suffered and continues to suffer substantial damages in an amount to be determined at trial.

## COUNT III

## VICARIOUS COPYRIGHT INFRINGEMENT

## (Against Defendant Rumble, Inc.)

132.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

133.    Direct copyright infringement occurred as set forth in Count I.

*Right and Ability to Supervise*

134.    Rumble had both the legal and the practical ability to supervise and control user infringement on its platform. Its Terms of Service reserved Rumble's sole authority to remove or restrict content and to terminate user accounts.

135.    Rumble exercised that control in practice by: (a) receiving and processing DMCA notices; (b) responding to Plaintiff's notices by requesting a consolidated email, demonstrating actual engagement with the notice process; and (c) "privating" certain identified videos, an administrative intervention proving Rumble had the technical means to control content availability.

136.    Instead of permanently removing infringing content or terminating repeat infringers as required by 17 U.S.C. § 512(i)(1)(A), Rumble used partial and temporary measures that did not disable access and did not prevent republication.

137. On or about April 25, 2025, Rumble removed Rucker from the platform, confirming its ability to terminate repeat infringers. Rucker subsequently publicly acknowledged the ban and evaded it by returning under new channel names. Exhibit 55.

138. Rumble's awareness of the Individual Defendants' conduct extended beyond copyright notices. Plaintiff's moderation and legal communications to Rumble documented doxxing, threats, and defamation across the same channels on which infringement was occurring. Exhibit 45.

### Direct Financial Benefit

139. Rumble derived a direct financial benefit from the infringing activity.

140. The infringing content served as a "draw" that attracted viewers, subscribers, and advertising engagement to Rumble's platform. See Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 263–64 (9th Cir. 1996).

141. In "I'm BACK and I'm LIVE!" (September 2, 2023), Rucker confirmed on camera that Rumble was monetizing his channel: "All my videos and I've only been on Rumble for about like two, three days now." Exhibit 14.

142. In "No Peace Until the Judge Tells Me" (November 28, 2024), Rucker stated: "We making money over on Rumble… those subscribers pay… I'm making money." Exhibit 29.

143. In "At the End of the Day" (November 10, 2024), Rucker stated: "I'm making more money and getting more views on Rumble than you on mother[expletive] YouTube." Exhibit 27 at 00:13:40.

144. In "I'm Back Live Season Premier" (August 1, 2025), Rucker delivered a paid sponsorship advertisement for Rumble Premium during a broadcast that contained Plaintiff's registered works. Exhibit 30.

27

145. In "A Failed Getaway & A Failed Deal" (October 19, 2024), Rucker confirmed multi-platform monetization of the infringing content. Exhibit 21.

146. Rumble also earned subscription revenue through its Locals subsidiary, where content subject to Plaintiff's DMCA notices was republished behind a paywall.

147. Rumble is not entitled to safe harbor under 17 U.S.C. § 512(c) because it had actual and "red flag" knowledge of specific infringements, failed to act expeditiously, received a direct financial benefit, and had the right and ability to control the infringing activity. See 17 U.S.C. § 512(c)(1)(A)–(B).

148. As a direct and proximate result of Rumble's vicarious infringement, Plaintiff has suffered actual damages, lost revenue, and ongoing harm in an amount to be determined at trial.

**COUNT IV**

**DEFAMATION PER SE**

**(Against Defendants Rucker, Lovell, and Edwards)**

149. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

150. Plaintiff is a private individual.

151. Defendants published false statements of fact about Plaintiff to third parties through monetized livestream broadcasts, video uploads, and persistent titles and thumbnails.

152. Under Nevada law, the elements of defamation are: (1) a false and defamatory statement of fact concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault amounting to at least negligence; and (4) damage, actual or presumed. See Pegasus v. Reno Newspapers, Inc., 118 Nev. 706, 714, 57 P.3d 82, 87 (2002).

153. Whether a challenged publication constitutes an actionable statement of fact or a protected opinion depends on how a reasonable viewer would interpret it in context. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 19–20 (1990).

154. Defendants' challenged publications were presented as assertions of fact, accompanied by purported "receipts," documents, and authoritative visual framing. They were not presented as opinion, parody, or rhetorical hyperbole.

155. Each defamatory publication identified below was "of and concerning" Plaintiff. Defendants specifically identified Plaintiff by his legal name and by the referral names they used for him throughout the campaign, including "DJ Torch," "Tampon," "DJ Door Dash," and "A certain dj," and by displaying his photograph and employment-related information. References in Defendants' broadcasts and exhibits to "Prism" and "Tam" refer to other individuals who were also targeted by Defendants' campaign and who appear in the exhibits incorporated herein.

***Representative Defamatory Publications***

156. The publications described in the following paragraphs are representative. Each was unprivileged, published to third parties, false, and made with at least negligence.

***Statement 1: Drug Addiction Accusation***

157. On July 17, 2023, Rucker originated and thereafter repeatedly republished the false statement that Plaintiff is a drug addict. The source broadcast was titled "False Bashes Black Men Narrative by Tam." Exhibit 9.

158. The accusation was republished through a recurring audio bumper and in titles including "PSA: Much Ado About a Self-Proclaimed Drug Addict" and related videos by Rucker, and was further republished by Lovell and Edwards.

29

158a.    Lovell independently republished the same false accusation on April 4, 2024, stating to a live audience: "I mean, he is on drugs. I mean, literally." Exhibit 22 at 01:20:45. Unlike the manufactured soundbite originated by Rucker, Lovell's statement was a spontaneous, first-person assertion of fact directed at Plaintiff by name and presented to viewers as personal knowledge. This constitutes an independent act of defamation per se — not derivative of Rucker's edited audio — and further establishes coordinated republication of the false drug accusation across multiple Defendants. In the same broadcast, Lovell also declared: "he lied. He, he tried to actually tried to commit fraud," id. at 01:33:13 — a separate false imputation of criminal fraud directed at Plaintiff before a live monetized audience.

159.    In his original broadcast, Plaintiff used the word "addict" as a rhetorical analogy. Defendants extracted and looped an isolated phrase to create the false impression of a factual confession.

160.    Plaintiff is not a drug addict and has not confessed to drug addiction. A clean drug test is documented in Exhibit 49.

161.    The publication imputed to Plaintiff serious moral turpitude and criminal drug use, and constitutes defamation per se.

***Statement 2: "Fake Copyright Strikes" / "Copyright Criminal" Accusation***

162.    Beginning on July 30, 2023 and repeated thereafter, Rucker, Lovell, and Edwards each published the false statement that Plaintiff filed "fake" copyright strikes and engaged in copyright fraud or criminal conduct. Exhibits 11, 6, 13, 18.

163.    Rucker stated in his November 15, 2023 counter-notification: "James Dillard has no copyright protection on his channel." Exhibit 18.

30

164. This statement was false. Plaintiff owns valid, federally registered copyrights identified in Exhibit 1, as Rucker well knew.

165. Each of the Individual Defendants admitted on camera that their channel removals resulted from their own conduct and not from any action by Plaintiff. Exhibits 13, 14, 15, 26.

166. In the alternative, even if the actual malice standard applies, Plaintiff satisfies that standard: publishing a false accusation of criminality after admitting the accusation is false is textbook actual malice. See New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964).

167. The accusation imputed dishonest and criminal conduct to Plaintiff, harmed his credibility with platforms and audiences, and interfered with his professional activities. It is defamation per se.

***Statement 3: Email Hacking / "Bots" Accusation***

168. On December 2, 2023, Lovell published a YouTube broadcast titled "Prism and DJ Tampon BROKE INTO My Email Account." Exhibit 19.

169. In that broadcast, Lovell accused Plaintiff of sending "bots," breaking into Lovell's email account, and disabling Lovell's accounts.

170. The accusation was false. Plaintiff did not access or attempt to access Lovell's email or any of Lovell's accounts, and did not deploy any "bots" against Lovell.

171. The accusation imputed serious criminal conduct — unauthorized computer intrusion in violation of federal and state computer-crime statutes — and is defamation per se.

***Statement 4: Pornography Participation / Sexual Deviant Accusation***

172. On July 5, 2023, in "DJ Torch's Lies and Schemes Come to an End" (Exhibit 8), Lovell stated: "retired gay porn star James Deep throat," and "this former gay porn star. Now we know why… he from San F[rancisco]."

173. Edwards published related broadcasts on October 30, 2025 and November 1, 2025 ("DJ Torch Will Fail" and "DJ Torch") asserting Plaintiff's sexual orientation as part of a purported exposition of Plaintiff's "business model." Exhibits 31, 54.

174. Plaintiff has never participated or performed in any form of pornography, and has never held himself out as a "porn performer."

175. The accusations are highly stigmatizing and impute serious moral turpitude. They are defamation per se.

*Statement 5: "Cyber Criminal" / Stalking Accusation*

176. On June 5, 2024, Lovell published a Rumble video titled "CCB Cyber Criminal aka Mr. Dillard Bandit." Exhibits 41, 47.

177. Additional broadcasts published the label "Cyber Stalker" and similar characterizations on July 24, 2024 and thereafter, and those titles remained publicly indexed and accessible as of the filing of this Complaint.

178. Plaintiff has never been charged with, investigated for, or convicted of any stalking or cyber-crime offense.

179. The use of the title "CCB Cyber Criminal" invokes the Copyright Claims Board — a federal adjudicatory body — in direct conjunction with the word "criminal," creating the false impression that a federal body had adjudicated Plaintiff guilty of a crime.

180. These persistent titles and labels remain indexed and discoverable through major search engines and platform search functions, causing ongoing reputational injury.

181. The accusation is defamation per se because it imputes criminal conduct.

*Statement 6: FBI Investigation Allegation*

32

182. On June 6, 2024, Lovell published "The FBI Is Now Involved… The Last Days of Prism." Exhibit 25. Lovell stated: "We have a real FBI agent on the case. Now we are going to finally bring Prism to justice for cyber crimes."

183. On November 28, 2024, Rucker published "No Peace Until the Judge Tells Me" (Exhibit 29), which republished and reinforced the same false FBI narrative.

184. No FBI or law enforcement investigation of Plaintiff exists or has ever existed. Rucker's own IC3 complaint, reproduced in the public record, is contradicted by his own on-camera admissions. Exhibit 33.

185. The statement imputes serious criminal exposure to Plaintiff, including the suggestion of active federal investigation and potential imprisonment, and is defamation per se.

***Libel Per Se by Persistent Titles***

186. To the extent Defendants' persistent titles and thumbnails label Plaintiff with criminal conduct — including "CCB Cyber Criminal," "The Face of Cyber Stalking," and "FBI Is Now Involved" — such persistent labels, standing alone, constitute libel per se under Nev. Rev. Stat. § 200.510 and Nevada common law.

***Fault***

187. Defendants acted at least negligently in publishing the statements identified above. Plaintiff further alleges that Defendants acted with knowledge of falsity or reckless disregard for the truth, as shown by their on-camera admissions contradicting the public accusations they continued to publish.

188. Plaintiff pleads negligence as the applicable fault standard because Plaintiff is a private individual who did not voluntarily inject himself into any public controversy. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974); Pegasus, 118 Nev. at 714.

189.    In the alternative, even if the Court were to apply the actual malice standard applicable to limited-purpose public figures, Plaintiff satisfies that standard. Each Defendant independently admitted on camera that Plaintiff's copyright enforcement did not cause their channel removals, yet each continued to publicly accuse Plaintiff of "fake copyright strikes" and criminal conduct. Publishing a false accusation of criminality after admitting the accusation is false is textbook actual malice. New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964).

*Per Se Defamation and Damages*

190.    Statements 1 through 6 impute criminal conduct, serious moral turpitude, and/or professional unfitness, and therefore constitute defamation per se. Damages are presumed.

191.    In addition to presumed damages, Defendants' publications directly and proximately caused Plaintiff to suffer actual, quantifiable harm, including loss of monetization revenue, loss of professional opportunities, and reputational injury.

**COUNT V**

**FALSE LIGHT INVASION OF PRIVACY**

**(Against Defendants Rucker, Lovell, and Edwards)**

192.    Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

193.    Under Nevada law, a false light claim arises when a defendant publicizes a matter concerning another that places that person before the public in a false light that would be highly offensive to a reasonable person, and the defendant had knowledge of, or acted in reckless disregard as to, the falsity of the publicized matter and the false light in which the other would be

34

placed. See Franchise Tax Bd. of Cal. v. Hyatt, 133 Nev. 826, 407 P.3d 717 (2017); Restatement (Second) of Torts § 652E (1977).

194.   False light is distinct from defamation. Defamation protects a plaintiff's reputation against false statements of fact; false light protects a plaintiff against the cumulative misleading impression created by the manner in which information is presented, including through editing, framing, juxtaposition, and repetition. The false light count is not duplicative of the defamation count because it captures the misleading impressions created by Defendants' presentation techniques that are not reducible to any single false statement of fact.

*False Light #1 — "Confessed Drug Addict"*

195.   On July 17, 2023, Plaintiff used a metaphorical analogy in a livestream comparing the addictive nature of certain online content to drugs.

196.   Rucker extracted an isolated phrase ("I am a drug addict"), removed the surrounding context, and repeatedly looped the soundbite as an audio bumper across multiple monetized broadcasts.

197.   The method of presentation — selective clipping, looping, and repetition as a recurring bumper — created a materially false and highly offensive impression that Plaintiff had confessed to drug addiction.

198.   The "drug addict" bumper was republished in dozens of monetized broadcasts across Rumble, YouTube, and Locals, reaching mass audiences and creating sustained reputational harm.

199.   Rucker acted with knowledge or reckless disregard as to falsity because he had access to the full unedited source recording and deliberately chose a presentation method designed to convey the opposite of its true meaning.

*False Light #2 — "Closeted Sexual Deviant / Porn Performer"*

200.    Lovell and Edwards packaged a sustained "exposé" narrative portraying Plaintiff as a porn performer and/or sexual deviant and presented that narrative as literal truth.

201.    Lovell publicly broadcast stigmatizing characterizations while simultaneously displaying Plaintiff's photograph and employment information, reinforcing the impression of factual credibility. Exhibit 8 at 00:38:27–00:42:08.

202.    Edwards constructed a sustained false narrative across multiple broadcasts, framed as factual analysis, asserting Plaintiff's sexual orientation as part of a thesis about Plaintiff's business model. Exhibits 31, 54.

203.    The sexual-deviant narrative was republished across at least five separate broadcasts spanning July 2023 through January 2025 and reached mass audiences.

204.    Defendants acted with at least reckless disregard by presenting the narrative as fact, repeatedly republishing it, and failing to identify any supporting evidence.

*False Light #3 — "Failed, Destitute, and Professionally Humiliated"*

205.    Defendants selectively displayed and repackaged litigation-related and economic information to construct a "downfall" narrative portraying Plaintiff as professionally ruined and financially destitute.

206.    Rucker publicly disclosed Plaintiff's employment information for mockery, framed Plaintiff's circumstances as humiliation content, and displayed legal documents as comedic material. Exhibits 21, 30.

207.    Lovell conducted a long-form broadcast portraying Plaintiff as dependent and degraded. Exhibit 20.

36

208. Even where certain underlying items contained truthful components, Defendants' selective presentation, omission of context, and ridicule-oriented framing created a materially false overall impression of Plaintiff.

209. The "downfall" narrative was reinforced through the on-camera display and shredding of Plaintiff's court filings during active litigation, the broadcast of financial details from Plaintiff's in forma pauperis application, and targeted employment mockery ("DJ DoorDash").

*False Light #4 — "Absent, Neglectful Father"*

210. Beginning in June 2023, Rucker constructed and perpetuated a sustained narrative portraying Plaintiff as an absent, neglectful, and irresponsible father across multiple monetized broadcasts.

211. In "Much Ado About a Stalker — Father's Day Special, Part 2" (June 2023), Rucker disclosed private and sensitive details about Plaintiff's adult daughter, including her reproductive history, to a mass audience without consent or legitimate public interest. Exhibit 44 at 00:50:40–00:50:50.

212. In "Doubling Down, This Is Only the Beginning" (July 26, 2023), Rucker republished and further reinforced the negative characterization of Plaintiff as a failed father. Exhibit 51.

213. On November 10, 2024 — during the pendency of this federal action — Rucker revisited and amplified this narrative by explicitly labeling Plaintiff a "deadbeat dad" in a monetized Rumble broadcast: "You sucked as a producer, deadbeat dad." Exhibit 27 at 00:14:00.

214. The cumulative effect of Rucker's disclosures, characterizations, and explicit labeling was to place Plaintiff before the public in the false light of an absent, neglectful father.

215.    The portrayal is materially false. No court has ever ordered Plaintiff to pay child support for the child referenced, and Plaintiff has never been adjudicated delinquent with respect to any such obligation.

216.    Rucker acted with actual knowledge of falsity or, at a minimum, reckless disregard for the truth. Rucker lacked any factual or evidentiary basis for characterizing Plaintiff as a "deadbeat dad." See Time, Inc. v. Hill, 385 U.S. 374 (1967); Cantrell v. Forest City Publ'g Co., 419 U.S. 245 (1974).

*Offensiveness, Fault, and Constitutional Compliance*

217.    Each false light portrayal would be highly offensive to a reasonable person when evaluated in context, including the repetition, scale of publication, and identity-reinforcement techniques used.

218.    Defendants acted with knowledge or reckless disregard as to falsity and the false light created. This is shown by: (a) possession of and access to original source materials and deliberate decontextualization; (b) "receipts" and exposé framing and identity reinforcement used to convey factual credibility; and (c) repetition and republication over time in monetized formats.

219.    To the extent constitutional fault principles are implicated, Plaintiff alleges facts supporting knowledge of falsity or reckless disregard, including deliberate editing and narrative packaging designed to convey literal factual meaning.

*Damages*

220.    As a direct and proximate result of Defendants' false light publications, Plaintiff has suffered significant emotional distress, reputational injury, and economic harm, including but not limited to loss of monetization opportunities and impairment of professional relationships.

38

221. The false light portrayals alleged herein are representative. Additional instances are documented in Exhibits 6, 9, 10, 20, 21, 27, 30, and 31.

## COUNT VI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Defendants Rucker, Lovell, and Edwards)

222. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

223. Under Nevada law, a claim for intentional infliction of emotional distress requires: (1) extreme and outrageous conduct by the defendant; (2) intent to cause, or reckless disregard for causing, emotional distress; (3) severe emotional distress actually suffered by the plaintiff; and (4) a causal connection between the conduct and the distress. See Star v. Rabello, 97 Nev. 124, 625 P.2d 90 (1981).

224. Defendants engaged in a deliberate, multi-year campaign of extreme and outrageous conduct specifically targeting Plaintiff by name across multiple monetized online platforms, including YouTube, Rumble, and Locals.

225. The campaign was not sporadic or incidental. It was systematic, coordinated, and persistent.

226. The campaign began in June 2023, escalated after the filing of this federal action in June 2024, and has continued unabated through the date of this Complaint.

227. Plaintiff's contemporaneous notifications to Rumble, Inc. — the primary platform involved — provide independent corroboration of the scope, duration, and escalation of

Defendants' campaign. Those notifications span September 12, 2023 to October 31, 2025 and document each phase of the campaign in real time. Exhibit 45.

***Phase One — Campaign Launch with Stated Methodology (June–October 2023)***

228.   The campaign commenced on Father's Day, June 2023, with a two-hour monetized broadcast by Rucker titled "Much Ado About a Stalker — Father's Day Special, Part 2." Exhibit 44.

229.   In that broadcast, Rucker articulated his methodology:

> *"I'm gonna find a wound on you, and I'm gonna pour the salt on it. I'm gonna keep doing it over and over and over again."*
> *Exhibit 44 at 01:42:30–01:42:40.*

230.   Rucker disclosed private details about Plaintiff's daughter's reproductive history to a mass audience. Exhibit 44 at 00:50:40–00:50:50.

231.   On July 5, 2023, Lovell stated: "If I ever see you in real life, DJ [Torch], I'm gonna stomp your ass," and "You have to put a hit out on him… you gotta kill his ass." Exhibit 17 at 00:45:03–00:45:10, 00:52:07–00:54:20.

232.   Edwards added in the same period: "I'm gonna find some way to get that nigga though." Exhibit 17 at 00:54:01–00:55:57.

233.   Rucker stated: "Me and Peso are making a very small temporary Alliance to get rid of DJ Torch." Exhibit 11 at 00:11:20–00:11:30.

234.   Edwards admitted in the same period to possessing Plaintiff's phone numbers and residential address: "he has no idea how much information I really do have on him." Exhibit 10 at 21:45.

235.   In the same period, Edwards directed the following threat at Prism, another individual targeted by the coordinated campaign: "I'm gonna find you. I swear to God I'm gonna

find you." Exhibit 16 at 01:03:01–01:03:08. This conduct is part of the same pattern of threatening behavior that Edwards directed at targets of the campaign, including Plaintiff.

*Phase Two — Doxxing, Document Disclosure, and Abuse of Process (October 2023–June 2024)*

236.   In "63 Year Old Man Child — The Truth Is Out Now" (December 17, 2023), Lovell conducted a three-hour monetized broadcast disclosing Plaintiff's residential address, family members' identities, and financial information from court filings. Exhibit 20.

237.   A participant in that broadcast stated: "you gotta bust him in the shit dog… split his fucking wig dog." Exhibit 20 at 00:59:03.

238.   During the same period, Rucker filed official complaints based on the false narrative that Plaintiff's copyright enforcement caused his channel removal, despite previously admitting his own policy violations led to the termination. Exhibits 14, 15.

239.   Rucker submitted a written demand to the Copyright Claims Board accusing Plaintiff of "bad faith" (December 3, 2023) and filed a federal law enforcement complaint characterizing Plaintiff's actions as criminal, after Rucker's own admissions contradicted those accusations. Exhibit 33.

240.   On March 26, 2024, Rucker announced five "demands" that Plaintiff must meet before he would stop the campaign, including reinstatement of all of Rucker's original channels and Plaintiff's agreement never to sue him. Exhibit 23 at 00:36:06–00:40:40.

240a.   Nine days later, on April 4, 2024, Rucker and Lovell co-hosted a joint Rumble livestream in which they escalated the punitive character of the campaign. Rucker declared: "it's just him being punished publicly like this. That's fine. I don't mind," Exhibit 22 at 01:18:08, and later warned: "you can't afford to keep trying… you don't wanna get that knock on your door."

Id. at 02:20:28. He further stated: "Torch is going to be the example." Id. at 02:19:21. Lovell threatened to go to Plaintiff's mother's home — "I'm gonna try to go up to your mama's house… I want that house" — and claimed: "I put a lien on your fucking mama's house." Id. at 01:36:51. Lovell also called on the audience to "push for YouTube to sue his ass." Id. at 01:18:55. These statements, made jointly and on a shared platform, demonstrate a deliberate intent to cause severe emotional distress through public humiliation, physical threat, and third-party harm, and are direct evidence of the extreme and outrageous character of the campaign.

241.    Lovell independently employed the same framework. In "The Predator Pedo Protector Cyber Ring" (July 5, 2023), Lovell stated: "I'm gonna offer DJ Torch a deal… I stop roasting you… if you make a video apologizing to me… and I want my hundred dollars that you owe me." Exhibit 7 at 02:09–05:12.

242.    Lovell then threatened: "If you don't take that deal, then I'm going to continue to roast you, drag you… and go after those women on your show." Exhibit 7.

***Phase Three — Active Litigation Does Not Stop the Campaign (June 2024–March 2026)***

243.    Plaintiff filed this federal action on June 24, 2024. Defendants did not cease their conduct. Instead, they acknowledged the pending litigation and explicitly continued.

244.    On November 10, 2024, Rucker stated:

> *"We can make this permanent if you like, so you keep putting out that black man hate speech. The rain won't stop."*
> *Exhibit 27 at 00:14:24–00:14:40.*

245.    On March 20, 2026, Rucker broadcast "Worry About Getting a Job You Bum (Part 2)" on Rumble during active litigation, announcing "part two of the downfall series" targeting Plaintiff by name. Exhibit 46 at 00:32:21.

246.    On March 26, 2026, Rucker broadcast "Staying on Necks FOREVER," repeating the phrase "We gonna be on your neck forever" five separate times. Exhibit 46B at 00:00, 01:25, 05:05, 05:50, 09:40.

***Phase Four — Geographic Proximity and Credible Physical Threats (October–November 2025)***

247.    On January 28, 2024, after his September 2, 2023 and September 10, 2023 admissions, Rucker stated: "I'm not gonna stop making fun of this guy until a few things happen. I get a paid settlement, and/or his channel gets removed from the platform [YouTube] permanently." Exhibit 41 at 00:02:36–00:02:50.

248.    On October 30, 2025, Edwards publicly announced that he had relocated to North Las Vegas, Nevada — the same city where Plaintiff resides — for four to six months. Exhibit 31 at 00:01, 03:31.

249.    Two days later, while physically present in Plaintiff's city, Edwards stated:

*"Sometimes I wish some motherfuckers pop up. I'll beat the shit outta 'em in real life."*

*Exhibit 31 at 07:11–07:22.*

*"You run up on me in real life and I know you be stalking me. I'm gonna beat the shit out you and I'm gonna be like, yo, they pulled a gun on me or some shit."*

*Exhibit 31 at 07:30–07:40.*

*"He'll probably be dead before he fucking have a real YouTube."*

*Exhibit 31 at 28:17–28:20.*

***Phase Five — Continued Conduct During Active Litigation (March 2026)***

250.    On March 5, 2026, Rucker stated:

*"We're gonna document his stalking waves and everything. We gonna fuck him up emotionally."*

*Exhibit 32 at 02:22:16.*

251.    Rucker further announced that he and "the team" would "always be targeting" Plaintiff. Exhibit 32 at 02:18:22, 02:19:25.

252.    Eight days later, on March 13, 2026 — the date of this Court's screening order — Rucker executed the threat by publishing "The Downfall of a Certain 'DJ' (Part 1: How It Started)" on Rumble, described as the "first part out of 4." Exhibit 32.

*Constitutional Compliance*

253.    Should Defendants argue that Plaintiff is a public figure, Plaintiff asserts that the IIED claim is independently supported by: (i) explicit threats of physical violence made while a Defendant was present in Plaintiff's city (Exhibit 31); (ii) doxxing of Plaintiff's home address and family members' private information (Exhibits 20, 44); and (iii) knowingly false factual accusations published after Defendants made on-camera admissions contradicting those accusations (Exhibits 14, 15, 26).

254.    These actions are not protected under Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988), and independently meet the extreme and outrageous standard.

*Severity of Emotional Distress*

255.    As a direct result of Defendants' extreme and outrageous conduct, Plaintiff has suffered and continues to suffer severe emotional distress.

256.    Plaintiff's distress includes persistent anxiety, hypervigilance, fear for his personal safety arising from Edwards's proximity and threats, changes to daily routines for security, disrupted sleep, humiliation from public disclosure of private information, loss of professional opportunities and revenue, and the ongoing need to monitor Defendants' broadcasts.

257.    Plaintiff's emotional distress has been severe, ongoing, and objectively observable by others, including medical professionals.

44

258. Approximately six months prior to the filing of this Complaint, during Phase Four of Defendants' campaign, Plaintiff's treating physician increased Plaintiff's blood pressure medication in direct response to the symptoms Plaintiff reported.

259. The medication change constitutes objective, physician-documented evidence of the severity of Plaintiff's distress and is corroborated by medical records.

260. Plaintiff's daily life has also been concretely and verifiably altered. Plaintiff has significantly curtailed his movements outside his residence and has ceased recreational activities, including summer fishing trips, that he previously engaged in regularly.

261. Plaintiff has also ceased posting personal content on social media platforms, including Facebook and Instagram, where he previously shared regular updates. This cessation is directly attributable to Defendants' doxxing of his residential address and reasonable fear that further disclosures will be exploited by Defendants.

262. These behavioral changes are documented, verifiable departures from Plaintiff's pre-campaign routine, are observable by those who know Plaintiff, and are causally attributable to Defendants' conduct.

263. The distress continues because Defendants have stated their intent to persist in their conduct. Plaintiff seeks compensatory damages, punitive damages under Nev. Rev. Stat. § 42.005, and injunctive relief.

264. The acts identified in this Count are representative; additional instances are documented in Exhibits 6, 7, 8, 10, 11, 14, 17, 19, 20, 25, 26, 27, 30, 31, 32, 35, 41, 42, 44, and 47.

**COUNT VII**

**INVASION OF PRIVACY**

**(Intrusion Upon Seclusion; Public Disclosure of Private Facts)**

**(Against Defendants Rucker, Lovell, and Edwards)**

265.   Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

266.   Nevada law recognizes both intrusion upon seclusion and public disclosure of private facts as distinct and independently actionable invasions of privacy. See PETA v. Berosini, 111 Nev. 615, 895 P.2d 1269 (1995); Restatement (Second) of Torts §§ 652B, 652D (1977).

267.   The two branches are separately actionable. The Court's prior characterization of the prior pleading as a "single claim" does not preclude Plaintiff from asserting each branch on the facts alleged herein.

*Intrusion Upon Seclusion*

268.   To establish intrusion upon seclusion, Plaintiff must plead: (1) an actual, reasonable expectation of seclusion; (2) an intentional intrusion; and (3) that the intrusion would be highly offensive to a reasonable person. PETA, 111 Nev. at 630; Restatement (Second) of Torts § 652B.

269.   Plaintiff maintained a reasonable expectation of seclusion in his residential address, his family members' identities, financial information submitted under statutory process, and personal details about his daughter.

270.   Defendants engaged in a pattern of intentional and affirmative conduct to intrude upon Plaintiff's private affairs by actively investigating, acquiring, and publicly disseminating Plaintiff's confidential and sensitive personal information. This conduct was not incidental or inadvertent.

271. In "63 Year Old Man Child" (December 17, 2023), Lovell admitted on camera: "I know his brothers, his sisters, his first cousin, his nieces, nephews," and disclosed Plaintiff's birth year, birth month, legal name suffix, parents' approximate ages, and residential arrangements. Exhibit 20 at 00:20:17–00:21:34.

272. Lovell further identified by name the third-party property owner associated with Plaintiff's address. Exhibit 20 at 00:56:58. The scope and specificity of these disclosures demonstrate affirmative investigation into Plaintiff's private affairs, not incidental knowledge.

273. Rucker admitted that he "accidentally" uploaded an email containing Plaintiff's legal name as a video thumbnail, resulting in his own channel being shut down — an admission confirming that he possessed and had already displayed Plaintiff's private identifying information. Exhibit 15 at 01:55:10–01:56:06.

274. In "Much Ado About a Stalker — Father's Day Special, Part 2" (June 2023), Rucker disclosed private details about Plaintiff's adult daughter, including her reproductive history, to a mass audience. Exhibit 44 at 00:50:40–00:50:50. Such information is not a matter of legitimate public concern.

275. On October 30, 2025, Edwards announced he had relocated to Plaintiff's city and stated he would "find out" more about Plaintiff. Exhibit 31 at 00:01–03:31, 26:42–26:50.

276. Edwards's announcement, combined with his physical co-location in Plaintiff's city, created a reasonable apprehension that the intrusion would escalate to physical surveillance.

277. Edwards separately admitted on July 28, 2023 to possessing Plaintiff's phone numbers and residential address: "he has no idea how much information I really do have on him." Exhibit 10 at 21:45.

278. Defendants obtained and publicly displayed Plaintiff's private personal photographs, including a photograph taken in Plaintiff's bathroom ("Bathroom Selfie") and a personal informal self-portrait ("ShirtoffJames"), both registered under VAu 1-516-282.

279. These photographs were created by Plaintiff in private personal contexts and were never intended for mass public distribution. Plaintiff maintained a reasonable and actual expectation of seclusion in photographs taken in his own home, including his bathroom.

280. Defendants' deployment of these photographs as commercial thumbnails on monetized public broadcasts accusing Plaintiff of criminal conduct constitutes an intentional intrusion upon seclusion that would be highly offensive to any reasonable person.

***Public Disclosure of Private Facts***

281. To establish public disclosure of private facts, Plaintiff must plead: (1) specific private facts publicly disclosed; (2) that the disclosed facts bore no reasonable relationship to a matter of legitimate public concern; and (3) that the disclosure would be highly offensive to a reasonable person. PETA, 111 Nev. at 630; Restatement (Second) of Torts § 652D.

282. In "DJ Torch's Lies and Schemes Come to an End" (July 5, 2023), Lovell displayed Plaintiff's photograph and workplace information while making defamatory accusations and soliciting CashApp donations. Exhibit 8 at 01:39:15–01:44:42.

283. Plaintiff's specific workplace identity, in the context of a monetized harassment campaign, is not a matter of legitimate public concern.

284. In "63 Year Old Man Child" (December 17, 2023), Lovell disclosed details from Plaintiff's in forma pauperis court filing, including specific salary figures and rent disclosures. Exhibit 20.

285. A plaintiff's exercise of the statutory right to access the courts without prohibitive cost does not constitute voluntary public disclosure of the underlying financial information.

286. On August 1, 2025, Rucker disclosed Plaintiff's private employment information by referring to Plaintiff as "DJ DoorDash" for mockery. Exhibit 30 at 00:00:45–00:04:11. Plaintiff's specific employment is not a matter of legitimate public concern.

287. On November 10, 2024, Rucker displayed Plaintiff's in forma pauperis filing, including Plaintiff's unredacted signature page, to his live audience during active federal litigation. Exhibit 27 at 16:43–16:53; Exhibit 24.

288. In a "Dropping Names" broadcast (September 8, 2024, reuploaded to Locals.com on February 25, 2025), Rucker displayed Plaintiff's legal documents on screen during a monetized livestream. Exhibit 21, Facts #25, #31–33.

289. On March 13, 2026, during active federal litigation, Rucker displayed Plaintiff's private email address on screen for nearly four minutes (1:12–4:55) in a monetized Rumble broadcast. Exhibit 32.

290. Defendants publicly disclosed Plaintiff's private personal photographs — including "Bathroom Selfie" and "ShirtoffJames" (VAu 1-516-282) — by using them as thumbnails on monetized public videos accessible to mass audiences across Rumble, YouTube, and Locals.

291. No reasonable person who takes a personal photograph in the privacy of their own home would expect or permit that image to be used as the public identifier of a monetized harassment campaign.

292. The disclosure of these photographs, paired with defamatory titles such as "CCB Cyber Criminal," "The Face of Cyber Stalking," and "FBI Is Now Involved," associated Plaintiff's private images with false accusations of criminal conduct before a broad audience.

293. Each of the disclosures described above constituted a substantial, intentional, and unwarranted invasion of Plaintiff's privacy that would be highly offensive to a reasonable person in Plaintiff's position.

294. Defendants made these disclosures with actual knowledge, or at minimum reckless disregard, that the information was private, confidential, and not a matter of legitimate public concern.

295. As a direct and proximate result, Plaintiff has suffered significant humiliation, reputational injury, severe emotional distress, and ongoing harm to his personal and professional life.

296. Plaintiff's invasion-of-privacy claims arising from Defendants' use of his private personal photographs are independent of, and not preempted by, Plaintiff's copyright claims. Even if Defendants were to establish a fair use defense to any copyright claim, that finding would not extinguish Plaintiff's privacy claims, which arise from violations of Plaintiff's reasonable expectation of seclusion and the public disclosure of private images.

**COUNT VIII**

**CIVIL CONSPIRACY**

**(Against Defendants Rucker, Lovell, and Edwards)**

297. Plaintiff incorporates by reference each of the foregoing allegations as though fully set forth herein.

298.    Under Nevada law, a claim for civil conspiracy requires: (1) two or more persons; (2) who combine or conspire to accomplish an unlawful objective, or to accomplish a lawful objective by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) resulting damages to the plaintiff. See GES, Inc. v. Corbitt, 117 Nev. 265, 21 P.3d 11, 15 (2001); Collins v. Union Fed. Sav. & Loan Ass'n, 99 Nev. 284, 303, 662 P.2d 610, 622 (1983).

299.    Civil conspiracy is not an independent tort. It requires an underlying actionable wrong. The underlying actionable wrongs here include: willful copyright infringement (Counts I–III); defamation per se (Count IV); false light invasion of privacy (Count V); intentional infliction of emotional distress (Count VI); and invasion of privacy (Count VII).

**The Agreement**

300.    Beginning no later than June 2023, Defendants entered into an explicit and deliberate agreement to target Plaintiff through coordinated action.

301.    The agreement is not merely inferred from circumstantial evidence; it is expressly admitted by Defendants on camera in public broadcasts.

302.    Rucker stated in "The Deletion of DJ Torch and Friends Has Just Begun" (July 30, 2023): "Me and Peso are making a very small temporary Alliance to get rid of DJ Torch. 'Cause we both hate him for different reasons, but we're going to get rid of him." Exhibit 11 at 00:11:20–00:11:30.

303.    In the same period, Lovell stated: "We gonna, because I, 'cause I'm gonna get my lick back. I always get my lick back." Exhibit 17 at 00:38:38.

304.    Edwards stated in the same period: "I feel like we, we gotta retaliate, man. Like, you gotta do something to him." Exhibit 17 at 00:38:32.

**The Operational Structure — "Team Rucker"**

51

Case 2:24-cv-01143-APG-BNW   Document 44   Filed 04/07/26   Page 52 of 57

305. The conspiracy was an organized operation with defined roles. On September 8, 2024, Rucker described "Team Rucker" as operating in shifts to monitor Plaintiff:

> *"If it's not me, it's somebody on Team Rucker doing it for me. We take shifts… you got the morning shifts, I got that afternoon shifts, you got the evening shifts."*
>
> *Exhibit 21, Fact #35 at 01:21:09–01:21:30.*

306. Rucker confirmed the existence of a private WhatsApp group chat involving himself, Lovell, Edwards, and others. Exhibit 21, Fact #40 at 01:35:30–01:35:50.

***Overt Acts in Furtherance of the Conspiracy***

307. The following overt acts were committed in furtherance of the conspiracy.

308. Overt Act (a) — Coordinated counter-notification scheme. Rucker described: "Every time he sends out a complaint, we will send very similar notes, very similar emails showing YouTube, 'Hey, this guy's abusing your system. Maybe you should remove him.'" Exhibit 11 at 00:11:50–00:12:06. Rucker confirmed simultaneous filing by all three Defendants at 00:15:03. This act furthered the defamation, false light, and IIED torts by coordinating the evasion of takedowns and the retaliatory destruction of Plaintiff's channels.

309. Overt Act (b) — Coordinated copyright infringement. Rucker, Lovell, and Edwards jointly planned and executed a scheme to reproduce and publicly display Plaintiff's copyrighted works in monetized videos. Rucker expressly admitted the plan was to "always use his content, editing it, making sure we do commentary so it can fall under fair use." Exhibit 14 at 00:12:31–00:13:00. All three Defendants participated in the coordinated copyright infringement described in Counts I through III. This act furthered the copyright infringement torts alleged in Counts I–III.

310. Overt Act (c) — Simultaneous simulcast broadcasts. Rucker stated: "Me and Peso are going live at the same time because we're gonna do a simulcast, we're gonna tune into DJ

52

Torch and we're gonna roast him live." Exhibit 11 at 00:15:57–00:16:10. Rucker and Edwards separately described coordinated conduct to bait and target users, including the creation of dummy accounts to provoke responses. Exhibit 16 at 01:35:40–01:49:20. This act furthered the defamation, false light, and IIED torts.

311.    Overt Act (d) — Coordinated defamatory publication. Lovell, Rucker, and Edwards each published and republished false statements about Plaintiff. Rucker confirmed joint action: "Me and Peso and Marquis exposed you being unemployed through that civil court." Exhibit 27 at 00:12:00. This act furthered the defamation and false light torts.

312.    Overt Act (e) — Directed channel flagging. Rucker admitted directing a member of "Team Rucker" to flag another creator's channel without legitimate basis: "I didn't tell 'em what to flag him for. I just said, flag." Exhibit 21, Facts #2–3 at 00:12:22. This act furthered the IIED tort.

313.    Overt Act (f) — Coordinated platform reporting. In a "Marquis 911" broadcast (July 22, 2024), Lovell and Edwards discussed coordinated methods to remove Plaintiff's online presence. Exhibit 26. This act furthered the IIED and invasion of privacy torts.

314.    Overt Act (g) — Display and destruction of court filings. Rucker broadcast himself shredding Plaintiff's court filings on camera as monetized entertainment, stating: "even the FBI couldn't piece it up together." Exhibit 21, Facts #29, #34. This act furthered the invasion of privacy and IIED torts.

314a.    Overt Act (h) — Joint broadcast using infringed content and coordinated false legal threats. On April 4, 2024, Rucker and Lovell co-hosted a Rumble livestream in which: Rucker admitted deliberately constructing a thumbnail from Plaintiff's copyrighted photographs and timing the publication to the last day of Plaintiff's CCB amendment window, Exhibit 22 at

00:44:50; Rucker threatened to weaponize the livestream in pending litigation, stating "do you know I'm gonna use this against you on that John Doe lawsuit?" id. at 00:43:47; and Lovell declared to a live audience that "we are filing civil charges against him and criminal charges. We've already reported them to the FBI," id. at 01:32:12 — a false and coordinated claim made during the same broadcast in which Rucker committed copyright infringement. The simultaneous commission of infringement and fabrication of legal threats, in a jointly hosted broadcast, constitutes a single overt act in furtherance of the conspiracy and provides direct evidence of the Defendants' shared unlawful objective.

315.    Each Defendant had actual knowledge of the unlawful objectives of the conspiracy and intentionally participated in furtherance of those objectives.

316.    The conspiracy persisted and continued to operate after the filing of this action, as documented in Exhibits 21, 26, 27, 30, 31, 32, and 35.

317.    As a direct and proximate result of Defendants' conspiracy, Plaintiff has suffered substantial and ongoing damages, including reputational injury, severe emotional distress, loss of business opportunities, loss of monetization revenue, and costs incurred in responding to Defendants' coordinated campaign.

318.    Defendants are jointly and severally liable for all damages caused by any act committed in furtherance of the common scheme, regardless of which Defendant committed the specific act. See Collins, 99 Nev. at 303.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff James H. Dillard II respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally where appropriate, and grant the following relief:

**A.**   Injunctive Relief: A permanent injunction pursuant to 17 U.S.C. § 502 and this Court's equitable authority, directing Defendants and all persons acting in concert with them to immediately and permanently disable access to, and cease all reproduction, public display, distribution, and monetization of, Plaintiff's registered copyrighted works on any platform, and to cease all publication of content disclosing Plaintiff's private, confidential, or personally identifying information.

**B.**   Statutory Damages: An award of statutory damages pursuant to 17 U.S.C. § 504(c) for each infringed registered work, with enhancement up to $150,000 per work for willful infringement under 17 U.S.C. § 504(c)(2).

**C.**   Actual Damages and Profits: Actual damages, including lost licensing fees (Exhibit 40), and Defendants' profits attributable to the infringement, under 17 U.S.C. § 504(b), for works not covered by statutory damages.

**D.**   Compensatory Damages: An award of compensatory damages on Counts IV through VIII for all reputational, emotional, and economic injuries proximately caused by Defendants' conduct, in amounts to be proven at trial.

**E.**   Punitive Damages: An award of punitive damages against the Individual Defendants under Nev. Rev. Stat. § 42.005 for willful, malicious, oppressive, and fraudulent conduct, including conduct undertaken with actual knowledge of this pending federal action.

**F.**   Impoundment: An order directing the impoundment and destruction or other reasonable disposition of all infringing copies and materials in Defendants' possession, custody, or control, pursuant to 17 U.S.C. § 503.

**G.**   Costs and Fees: An award of costs of suit and reasonable attorneys' fees pursuant to 17 U.S.C. § 505 and any other applicable authority.

**H.**     Declaratory Relief: A declaration pursuant to 28 U.S.C. § 2201 that Defendants' conduct constitutes willful copyright infringement, defamation per se, false light, intentional infliction of emotional distress, invasion of privacy, and civil conspiracy.

**I.**     Such Other and Further Relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

## VERIFICATION

I, James H. Dillard II, declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing Fifth Amended Complaint is true and correct to the best of my knowledge, information, and belief; that I have personal knowledge of the facts alleged herein except where stated on information and belief; and that the exhibits attached hereto are true and accurate copies of the materials they purport to be.

Executed this 10th day of April, 2026, in North Las Vegas, Nevada.

Dated: April 7, 2026

Respectfully submitted,

*James Dillard II*

/s/ James H. Dillard II
James H. Dillard II
21 Raptors View Avenue
North Las Vegas, NV 89031
Telephone: (725) 314-4444

56

Email: djtorch07@gmail.com

Plaintiff, Pro Se